**Mayerson & Hartheimer, PLLC**
Sandra E. Mayerson, Esq.
David H. Hartheimer, Esq.
845 Third Avenue, 11th Floor
New York, NY 10022
Tel: (646) 778-4380
Fax: (646) 778-4384
sandy@mhlaw-ny.com
david@mhlaw-ny.com

*Counsel for Petitioner*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 |
| Total Debt Relief Ltd., | Case No. 18-_____ |
| Debtor in a Foreign Proceeding. | |

**DECLARATION OF STEPHEN JOHN HUNT IN SUPPORT
OF (I) VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN
PROCEEDING AND RELATED RELIEF; (II) EMERGENCY MOTION FOR
PROVISIONAL RELIEF; AND (III) *EX PARTE* NOTICE MOTION**

I, Stephen John Hunt, pursuant to 28 U.S.C. § 1746, hereby declare under the penalty of

perjury under the laws of the United States that the following is true and correct to the best of my

knowledge and belief:

1.      I submit this declaration in support of the: (a) *Verified Petition for Recognition of*

*Foreign Main Proceeding and Related Relief* [Docket No. 2] (together with the Form of Voluntary

Petition [Docket No. 1] filed concurrently herewith, the "Petition"); (b) *Emergency Motion for*

*Provisional Relief* [Docket No. 3] ("Provisional Relief Motion"); and (c) Ex Parte Motion for an

Order (I) Specifying Form and Manner of Service of Notice; (II) Scheduling Hearing on (A)

Recognition and Additional Relief and (B) Emergency Provisional Relief; and (III) Setting

Deadlines for Objections [Docket No. 5] ("Notice Motion") (collectively, the "Chapter 15 Pleadings") of Total Debt Relief Ltd. (the "Company" or "Debtor"). I have been shown a copy of each of the Chapter 15 Pleadings in this proceeding and have personal knowledge of the matters set forth herein.[1]

### Personal Background and Qualifications

2.      I am a qualified insolvency practitioner and Partner of Griffins, one of the largest independent insolvency practices in the UK, located at Tavistock House South, Tavistock Square, London, England, WC1H 9LG.

3.      I understand I am authorized to act as a "foreign representative" as such term is defined in section 101(24) of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code"). On September 11, 2018, upon the application of the Financial Conduct Authority (the "FCA"), the High Court of Justice (London, England) (the "UK Court") appointed me as provisional liquidator of Total Debt Relief Ltd. in relation to the liquidation requested by the FCA (the "UK Proceeding")[2] pursuant to the Insolvency Act 1986 (the "Insolvency Act") currently pending before the UK Court. See **Exhibit A** (the "Appointing Order").

4.      In undertaking my duties under the Appointing Order, I have relied upon the information and evidence presented to the UK Court and to me by the FCA, particularly the information set forth in the First Witness Statement of Andrew Spencer, dated September 10, 2018 (the "First Witness Statement," a copy of which is attached hereto as **Exhibit B**) and Skeleton

---

[1]      Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Petition.

[2]      The defined term the "UK" shall be used in this Declaration to refer to the United Kingdom of England, Scotland, Northern Ireland, and Wales.

Argument on Behalf of the FCA, dated September 11, 2018 (the "FCA Skeleton Argument," a copy of which is attached hereto as **Exhibit C**), both of which were submitted by the FCA in support of its September 11, 2018 winding up petition of the Company (the "Winding Up Petition," a copy of which is attached hereto as **Exhibit D**.)

### Background

**I.    Overview of the Company and Its Current Regulatory Status**

5.    The Debtor was incorporated in 2009 to provide debt management services to individuals in the UK. Debtor purports to conduct a review of each individual client's financial circumstances to devise a debt management plan and then negotiate with the client's creditors to settle the client's debts in accordance with the debt management plan. Ex. C, ¶ 2.

6.    Debtor operates on a full and final debt settlement model by which it collects a monthly payment from its clients (collectively, the "Client Funds") from which it deducts a service fee of approximately 30% of the client's total debt obligations to be managed under the debt management plan. Ex. B, ¶¶ 29-30.  The service fee is paid in monthly installments as part of the monthly fee that the customer pays to the Company for each month of the debt management plan. Id. The length of the debt management plan is calculated as the time it will take the customer to build a "war-chest" equal to 40% of the value of their outstanding debts.  Id.

7.    Debtor transfers the Client Funds into three client accounts (the "Client Accounts") with Barclays Banks UK Plc ("Barclays"). Id. at ¶ 34. The purpose of the Client Accounts is to segregate client funds from the Company's own funds which are held in two separate accounts with Barclays (the "TDR Own Account 1" and "TDR Own Account 2") in accordance with the requirements of the UK Financial Services and Markets Act 2000 (the "FSMA"), which regulates the Company's activities.  Id.

8.      The purpose of the three separate Client Accounts is to have one account from which the Debtor deducts its service fee, one Client Account from which the Debtor makes nominal monthly payments to creditors in the amount of £1 to £2 until a final, lumpsum settlement can be reached, and one account from which the Debtor is to make full and final settlement offers to creditors and which holds the majority of the Client Funds (the "Accumulation Account"). Ex C., ¶ 3. It is my understanding that the Client Funds consist of most, if not all, of an individual client's liquid assets.

9.      Prior to April 1, 2014, a regulatory agency other than the FCA was responsible for authorizing firms within the consumer credit industry. Id. at ¶ 5. Any firm that held a consumer credit license as of April 1, 2014, which included the Company, was permitted to continue operation on an interim basis, so long as, the firm applied for permanent authorization and such application had not been withdrawn or denied by the FCA. Id. The Company applied for permanent authorization in December 2014. While the FCA was statutorily required to decide the application within a year of the submission, the FCA was not able to complete a sufficiently thorough assessment of the Company to assess the application until recently. Ex. B, ¶¶ 124-126.

10.     On August 1, 2018, after the FCA had completed its investigation, it issued the Warning Notice of its intent to deny the Company's application because, among other things, the FCA was not satisfied with the quality of the Company's debt advice, the suitability of the debt settlement plans it operated, its record-keeping or the skills and competence of its management team. Ex. B, ¶ 47. The FCA was required to issue such warning notice in advance of denying the application to give the Company an opportunity to respond to the FCA's concerns. Id. The Company had not formally responded to the FCA or withdrawn its application. Ex. B, ¶ 49. As

such, the Company had authorization to operate on an interim basis until the Appointing Order

was entered by the UK Court on September 11, 2018. Ex. B, ¶ 44.

11.    I am advised that the Debtor's sole shareholder and Corporate Secretary, Lawrence

Kopylov, is a resident of Brooklyn, New York. I am also advised that the Company's sole director,

Eric Puzaitzer, is also a resident of Brooklyn, New York. According to the Company's latest public

filings, it does not have any officers or directors based in the UK despite exclusively servicing

residents of the UK. Id., Ex. B, ¶¶ 31-32, 38-42.

## II.    **Misappropriation of Client Funds**

12.    On or around August 30, 2018, the FCA was notified that the Debtor's only UK-

based director, Sarah Tabor-Thickett, had resigned. Id. at ¶ 49. The next day, the FCA sent an e-

mail to the Company to understand the impact of the resignation on its pending application. As of

the date the FCA requested the liquidation of the Debtor, the Debtor has not responded to the FCA.

Id.

13.    On August 31, 2018, the FCA sent a request to Barclays for copies of the account

statements for the prior three months for the Client Accounts, TDR Own Account 1, and TDR

Own Account 2. Based on analysis of the statements and correspondence with Barclays on or

after September 4, 2018, the FCA discovered that. Ex. C, ¶ 17:

    a.    From August 24, 2018, to August 31, 2018, the Company transferred £1,230,000

        of Client Funds from the Accumulation Account to TDR Own Account 1.

    b.    From August 24, 2018, to August 31, 2018, the Company transferred at least

        £1,150,000 from TDR Own Account 1 to TDR Own Account 2.

    c.    From August 28, 2018, to August 31, 2018, the Company transferred a total of

        £650,000 out of the TDR Own Account 2 to Halo Financial Ltd. ("Halo"), which

is authorized and regulated by the FCA to provide foreign exchange services. On September 4, 2018, the FCA contacted Halo to ascertain the location of the funds. Halo indicated that it had transferred the funds to an account at TD Bank N.A. ("TD Bank") in the United States in the name of Total Relief Marketing Solutions, LLC ("TRMS") on August 31, 2018.

d. From August 28, 2018, to August 31, 2018, the Company also transferred a total of £490,000 to Ebury Partners UK ("Ebury"), which is authorized and regulated by the FCA to provide electronic money services. On September 5, 2018, the FCA contacted Ebury to ascertain the location of the funds. Ebury indicated that it had transferred substantially all of the funds (£487,264.96) to an account at TD Bank in the United States in the name of KLM Management Corp. ("KLM").

e. TRMS is a company incorporated in New York with its registered office with the New York Secretary of State located at 2566 East 27th Street, Brooklyn, New York 11235. It is the FCA's understanding that Eric Puzaitzer and Lawrence Kopylov exercise significant control over TRMS as management and shareholders.

f. KLM is a company incorporated in New York with its registered office with the New York Secretary of State located at 55 Oceana Drive, East Suite 3D, Brooklyn, New York, 11235. Its Chief Executive Officer is Lawrence Kopylov, whom I am advised remains Corporate Secretary and sole shareholder of the Company.

14.    Prior to the above-described transfers, £1,212,179.42 was held in the Accumulation Account. By September 4, 2018, only £17,356.35 remained. See Ex. B, ¶¶ 49, 56-100.

15.     On September 4, 2018, the FCA imposed a formal restriction on Barclays to freeze the Client Accounts, TDR Own Account 1, and TDR Own Account 2. Id. at ¶106.

16.     While TD Bank does not necessarily agree that the FCA has authority over funds held at TD Bank, on or about September 7, 2018, TD Bank indicated that it would temporarily freeze the accounts of TRMS and KLM based on the FCA's representation that it intended to place the Company into liquidation and pursue formal recovery of the funds. Ex. C, ¶ 19.

17.     However, I have been informed by my United States counsel that, on October 1, 2018, counsel to TD Bank contacted Mr. David Hartheimer indicating that TD Bank would not provide assurance that it would continue to freeze the accounts of TRMS and KLM without a court order entered by a court of component jurisdiction in the United States instructing it to do so, which is why I am requesting emergency relief in order to safeguard the misappropriated assets of the Debtor.

## III.    The UK Proceeding

18.     As set forth in more detail in the Winding Up Petition and the First Witness Statement and FCA Skeleton Argument in support thereof, the FCA has power under section 367(3)(b) of the FMSA to petition the UK courts for the compulsory "winding up" or liquidation of a company if it is "just and equitable" for the company to be wound up, regardless of whether the company is insolvent. Ex. C, ¶¶ 20-22. The UK courts have found it to be "just and equitable" to force a company into compulsory liquidation where the company has engaged in fraudulent activity or where there has been a justifible loss of confidence in a company's management or directors. Id.

19.     On September 11, 2018, the FCA presented a winding up petition to the UK Court asserting that the Company must be wound up to: (a) ensure protection of the Company's consumer

clients; (b) effect appointment of an independent liquidator to (i) take control of the Company's assets and affairs, (ii) preserve any of the Company's books and records, and (iii) consider the commencement of litigation to recover any misappropriated funds. Ex. D.

20.     On September 11, 2018, the FCA also applied to the UK Court for appointment of a provisional liquidator pending a determination on the winding up petition. Id. Appointment of a provisional liquidator is considered an emergency remedy under section 135 of the Insolvency Act to be granted where there is evidence that: (a) a winding up order will likely be issued at the hearing of the petition; (b) there is a risk of jeopardy to the company's assets pending the hearing of the petition—either dissipation of the company's assets or loss or destruction of the company's books and records. Ex. C, ¶¶ 23-26, 29-34.

21.     Finding that the FCA had adequately presented such evidence, the UK Court entered the Appointing Order appointing me as provisional liquidator of the Company on September 12, 2018. Ex. A.

22.     On September 12, 2018, I submitted an *ex parte* application for injunctive relief against TRMS, KLM, Eric Puzaitzer, and Lawrence Kopylov (the "Enjoined Parties") from transferring any assets worldwide in their possession or control outside of the ordinary course, including any assets held in the accounts at TD Bank, which the UK Court granted on September 12, 2018.  After notice and a hearing, on September 26, 2018, the UK Court entered a final order extending the injunction to September 26, 2020 (the "Freezing Injunction," a copy of which is attached hereto as **Exhibit E**.)

### Relief Sought in The Petition

23.     It is my understanding that the Petition seeks certain additional discretionary relief under the Bankruptcy Code, including: (a) enforcement of the Appointing Order and Freezing

Injunction on a final basis; (b) staying the commencement or continuation of any action or proceeding concerning the assets, rights, obligations or liabilities of the Company, including execution against the Company's assets, to the extent not stayed by section 1520(a); and (c) authorizing me to issue subpoenas and conduct examinations of witnesses, take 2004 examinations, take evidence, seek production of documents, deliver information concerning the assets, affairs, rights, obligations or liabilities of the Company for the purposes of locating and analyzing the Company's assets and liabilities, and obtaining recovery of the Company's books and records (the "Discretionary Relief").

24.     I believe that the fair and efficient administration of the UK Proceeding requires approval of the Discretionary Relief.  Without the Discretionary Relief, I will not be equipped to protect and maximize the value of the Company's assets in the United States for the benefit of the Company's creditors—particularly the Company's clients whose Client Funds are believed to have been misappropriated by the Company.

25.     The UK and United States share the same common law traditions and fundamental principles of law, and I believe the UK Court has and will continue to afford all parties in interest a full and fair opportunity to be heard in a manner consistent with US expectations of due process.

26.     I believe that the relief requested by the Petition, including the Discretionary Relief, is consistent with the public policy of the United States as I seek to redress the fraud perpetuated on vulnerable consumer debtors who trusted the Company to remedy their financial troubles, not exacerbate them further.  This relief furthers fundamental principles shared by the United States and UK, including protection of consumers, integrity of the financial system, and accountability of corporate fiduciaries to their beneficiaries.

27.     I also believe that the relief requested by the Petition, including the Discretionary Relief, is consistent with the policies behind both chapter 15 and the Bankruptcy Code in general. The relief will ensure that I am able to preserve the Company's books and records to properly identify and evaluate transfers of the Company's assets and recover any assets, including the Client Funds, that may have been misappropriated to entities or individuals in the United States. If the relief is not granted, there is significant risk that the Company's books and records could be lost or destroyed and that the funds it held as trustee in the Client Accounts could be depleted or transferred in the detriment of the Company's clients.

### Relief Sought in the Provisional Relief Motion and Shortened Notice Motion

28.     It is my understanding that the Provisional Relief Motion seeks certain limited interim protection under the Bankruptcy Code pending the hearing date on the Petition, including: (a) enforcing the Appointing Order and Freezing Injunction in the United States on an interim basis until the Petition is granted; and (b) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor held by the Enjoined Parties, including, without limitations, the funds held in the bank accounts at TD Bank in the name of TRMS and KLM (collectively, the "Provisional Relief").

29.     I am concerned that the assets of the Debtor, including its books and records, that are currently in the possession, custody, and control of third parties may not be properly preserved. I believe the known transfers from the Company to TRMS and KLM—US-based entities under common control with the Debtor—demonstrate the irreparable harm to the Debtor and its creditors if the relief sought is not granted.

30.     Moreover, while the UK Court entered the Freezing Injunction against the Enjoined Parties in the United States and TD Bank has voluntarily agreed to temporarily freeze the accounts

of TRSM and KLM, the entities to which the funds in the Client Accounts are believed to have been transferred, there is no guarantee that the Freezing Injunction will be effective against US-based parties that may not be subject to the jurisdiction of the UK Court or have assets in the UK against which the UK Court could order enforcement.

31.     As a result, I believe the Provisional Relief is necessary to prevent irreparable harm that could result from the transfer, destruction, or depletion of the Debtor's assets within the territorial United States in the interim period before the hearing of the Petition.

32.     For the foregoing reasons, I believe the relief sought in the Petition, Provisional Relief Motion, and Shortened Notice Motion should be granted.

Dated:  October 17, 2018
London, England

s// Stephen John Hunt_____
Stephen John Hunt, as provisional liquidator of
Total Debt Relief, Ltd.